J-A06031-17

2017 PA Super 230

| ANTONIO CRESPO AND EDWARD TORRALVO | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| WILLIAM B. HUGHES, M.D.; AND HUGHES & HENSELL ASSOCIATES, P.C.; AND TEMPLE UNIVERSITY HOSPITAL, INC. | : | No. 2231 EDA 2016 |
| Appellants | | |

Appeal from the Judgment entered June 21, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): July Term 2012 No. 3490

BEFORE: PANELLA, J., SHOGAN, J., and RANSOM, J.

OPINION BY RANSOM, J.: **FILED JULY 18, 2017**

Appellants, William B. Hughes, M.D., Hughes & Hensell Associates, P.C., and Temple University Hospital, Inc., appeal from the judgment entered June 21, 2016, in favor of Appellees, Antonio Crespo in the amount of $4,679,676.00 and Edward Torralvo in the amount of $538,000, following a twelve-day jury trial finding Appellants liable for medical malpractice. We affirm in part but remand for a new trial limited to damages attributable to Appellee Crespo.

We adopt the following factual background from the trial court's 1925(a) opinion.

On the evening of June 16, 2011, [Appellees] Crespo and Torralvo were power washing a brick wall when, despite using protective gear, some of the hydrofluoric acid solution they were using made contact with their hands. The next day, June 17, 2011, [Appellees'] hands began to itch; this itching developed

into slight painful sensations. They proceeded to the Temple University Hospital ("TUH") emergency room that afternoon at around 2:00 p.m.

The burn unit at TUH was consulted, and attending burn specialist William Hughes, M.D. formulated a treatment plan for both patients. The treatment plan included initial treatment for pain management of the affected areas of the digits by injection of lidocaine. The treatment plan also included injection of calcium gluconate into the affected digits. The calcium gluconate was injected to counteract the hydrofluoric acid.

Crespo's affected digits were his left index finger and his left middle finger (his second and third digits). Those two fingers, though itching and having slight painful sensations, had appeared normal prior to the injections of calcium gluconate. Shortly after the injections, Crespo's two fingers became discolored, weeping and bleeding from the injected areas.

Torralvo, after having seen the effects of the injections of calcium gluconate on Crespo's fingers, terminated treatment after receiving some of the proposed injections. Crespo was discharged from the hospital[,] and Torralvo was either discharged or left the hospital.

Crespo's second and third digits became black and necrotic over the coming days, and they required partial amputation at or around the first knuckle away from the palm. Torralvo complained of pain after his limited set of injections, and he received surgery to remove a necrotic portion of his finger … reducing the mass and diameter of his index finger somewhat, especially towards the tip of the finger. They both complain of ongoing neurological injuries, with pain at the sites of the surgeries, especially with contact.

[Appellees'] expert on standard of care and causation, Dr. Mosier, testified that treatment of the areas affected with a calcium gluconate topical gel would have been within the standard of care on these facts, but injecting calcium gluconate into the affected digits, especially in this volume, was outside the standard of care on these facts, due to the risk of increased pressure cutting off blood flow to the digits. Moreover, Dr. McClellan, [Appellees'] treating physician for the amputations and excisions after the injuries occurred, also testified to

causation as it pertained to his treatment of Crespo. [Appellee] Crespo's psychiatric expert, Dr. Tereo, testified to Crespo's state of mind before and after the injuries occurred. [Appellants] offered Dr. Lozano as an expert on standard of care and causation and Dr. Toborowsky as a psychiatric expert. Relevant experts are discussed below in this section.

Crespo had significant pre-existing injuries to his back, which, at the time of his injuries giving rise to this suit, had prevented him from doing hard labor. However, prior to the injuries giving rise to this suit, he had been a "cuatro" guitarist[. A] cuatro guitar is a kind of stringed instrument popular in Puerto Rico. Crespo had played [with] the fingers of his left hand to place on the strings to obtain the notes; Crespo's left hand was his fret hand. His right hand was his "pick hand." The amputations of the fingers at or around the first knuckle on his fret hand affected his ability to obtain the notes. Crespo testified that after the amputations, despite great effort, he was no longer able to play the cuatro with any significant musical ability. Crespo's former music manager, David LaPonte ["Laponte"], testified at trial as to Crespo's former ability, album, and fee arrangements. Charlie Cruz ["Cruz"], a prominent Puerto Rican vocalist and band leader, testified as to Crespo's abilities and Cruz's experience with Crespo in his band, as well as the fee arrangements.

Specifically, the testimony, viewed in a light most favorable to [Appellee] Crespo, was as follows: (1) Cruz would receive a certain lump sum for a show; (2) Cruz would pay a portion of that lump sum to Crespo's music manager, [LaPonte], for Crespo's performance, and (3) Laponte would use the money to build Crespo's "brand" through promotion, travel, music production, and various media appearances, much of which was documented in the exhibits.

The specific dollar value that Cruz testified to was as follows: "Sometimes three, five [shows] a month. I would pay him between $1,500, sometimes $1,000, sometimes $2,000. Depends on the venue, how much I get paid, I pay the musicians" N.T., 2/4/2015, Cruz, at 68. Cruz later clarified by answering "yes" to a question as to whether the money went to management. *Id.*

In addition to the testimony just described, the jury viewed a

music video produced to feature Crespo playing his cuatro. [Appellees'] [v]ocational expert Robert Cipko, Ph.D. and economist David Hopkins testified as to income and lost wages.

Dr. Cipico, Crespo's vocational expert, testified to an hourly income range, then summed the hourly rate to an annual income; from $49,379 at the median for Philadelphian musicians and vocalists to $142,750 in the top ten percent of that same class, see N.T., Cipko, 2/3/16, at 82-84, less the residual earning capacity in the range of $16,230 in the bottom ten percent of entry level cashiers to $17,390 in the bottom twenty percent of cashiers, see *id.* at 88. Dr. Cipko also testified to other ranges such as slightly higher annual incomes for Pennsylvania musicians and vocalists, and slightly higher ranges for other entry level low physical labor employment.

Mr. Hopkins, Crespo's economist, testified to a total work-life lost earning capacity of between $962,321 to $6,311,287, depending on retirement age, projected income less residual earning capacity, and adjustments for the time-value of money and interest. N.T., Hopkins, 2/4/2016, at 43. The higher figure was a result of using, among other factors, the higher range from Dr. Cipko for musicians and vocalists in Philadelphia (90th percentile), a retirement age of 70, and a discount rate to present value using a rate of 2.5 %. *Id.*

The jury, given its verdict, apparently did not find the evidence sufficient to support the higher range of the wage loss claim. The jury ultimately concluded on the basis of the evidence that Crespo was entitled to recover for his lost future earnings in the amount of $2.262 million dollars. The jury's finding for the lost wages claim was well within the range of the testimony of Dr. Cipko and Mr. Hopkins.

The remainder of the verdicts were for pain, suffering, disfiguration, and future medical care of Crespo, and pain, suffering and disfiguration of Torralvo.

Trial Ct. 1925(a) Op. ("TCO"), 9/2/2016, at 2-7 (citations modified).

Appellants timely filed a post-trial motion on February 22, 2016, requesting a new trial, or in the absence of a new trial, remittitur on the

ground that the jury verdict was excessive. Following additional briefing, the post-trial motion was denied by order and memorandum on June 21, 2016. *See* Order and Memorandum, 6/21/2016. The court denied Appellants' motion to mold the verdict and granted Appellees' motions to mold the verdict to include delay damages. *See* Order, 6/21/2016. On June 21, 2016, the court entered judgments on the verdicts, including delay damages, in favor of Appellees as described above.

In July 2016, Appellants filed a post-sentence motion to strike the judgment, which the trial court denied, and filed a supersedeas bond to stay execution pending the outcome of the appeal. Thereafter, Appellants timely filed their notice of appeal and 1925(b) statement. The court issued a responsive opinion.

On appeal, Appellants raise the following issues:

1. Did the court err in denying [Appellants'] pre-trial motion *in limine* seeking to preclude [Appellee] Crespo's wage loss claim?

2. Did the court err in granting [Appellee Crespo's] motion *in limine* seeking to preclude references to [his] marijuana use and child support orders?

3. Did the court abuse its discretion when it permitted "fact witnesses," Dr. McClellan, Charlie Cruz, and David Laponte to offer expert opinions at trial?

4. Did the court err in not permitting [Appellant] Hughes and defense expert Lozano from addressing pathology findings that were raised and/or referenced by treating physician, Dr. McClellan?

5. Did the court err in allowing [Appellants'] standard of care

expert, Dr. Mosier, to testify outside the scope of his pretrial report?

6. Did the court err in limiting the testimony of defense expert, Dr. Toborowsky?

7. Did the court err in permitting cross-examination of [Appellant] Dr. Hughes with literature from 2015?

8. Did the court err in its handling of [Appellee Crespo's] criminal conviction?

9. Did the court err in denying [Appellants'] motion for remittitur?

Appellants' Br. at 4-5 (reordered for ease of analysis).

On appeal, Appellants contend that the verdicts are so excessive that a new trial is warranted. In addition, they contend that the trial court made several errors of law in ruling on motions *in limine*, handling objections, and charging the jury that affected the outcome of the trial. Appellants' Br. 8-9. We will address these claims *seriatim*.

## 1.    Wage Loss Claim

In their first issue, Appellants maintain that the court erred in denying their pre-trial motion *in limine* to preclude the wage loss claim. Appellants' Br. at 18; 1925(b) statement, 7/29/2016, at 1. According to Appellants, Crespo had earned income as a construction worker from 2001 to 2008, until injuring his back in an unrelated incident. However, Appellants claim that there was no documentary evidence to support his contention that he worked as a musician in 2009, 2010, or 2011, prior to his injury in this matter. Appellants argue that Crespo never filed any tax returns reporting

income he allegedly earned as a musician.[1]

The court effectively denied Appellants' pre-trial motion, noting that Appellants could cross-examine the witnesses, and utilize evidence such as Crespo's lack of reported income on his tax returns, to defend against the wage loss claim. *See* N.T., 1/29/2016, at 34.

> A trial court's decision to grant or deny a pre-trial motion *in limine* is subject to an evidentiary abuse of discretion standard of review. "Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. 'An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous.'" *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003). In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Parr v. Ford Motor Co.*, 109 A.3d 682, 690-91 (Pa. Super. 2014) (internal

---

[1] Appellants' motion pointed to statements made on Crespo's application for welfare benefits one month prior to his injury in May of 2011, as well as the lack of evidence that he had income in 2009 or 2010, his 2013 arrest in connection with a stolen car, and lack of evidence of employment. *See* Motion *in Limine* to Preclude Crespo's Claim for Earnings as a Musician, at 1-3. Further, Appellants argued that experts' opinions in support of Crespo's wage loss claim amounted to mere speculation or conjecture and that the court permitted him to present this claim in error. *See id.* at 3-4; *see also* Appellants' Br. at 15-17.

Notably, Appellants did not object to the sufficiency of the evidence presented at trial to establish a claim for lost wages, and that issue was not preserved for appellate review. Accordingly, we proceed to address whether the trial court's denial of Appellant's *pre-trial* motion *in limine* to preclude the wage loss claim was proper.

quotation marks and citations omitted, formatting modified) (quoting ***Keystone Dedicated Logistics v. JGB Enterprises***, 77 A.2d 1, 11 (Pa. Super. 2013) (internal citations omitted)).

In this Commonwealth, this Court has consistently held that the purpose of damages is to compensate victims to the full extent of the loss sustained as a direct result of the injury. ***Kaczkowski v. Bolubasz***, 421 A.2d 1027, 1029 (Pa. 1980). Lost future earnings is a distinct item of damages, which may be awarded if properly proved and not left to mere conjecture. ***Helpin v. Trustees of Univ. of Pa.***, 10 A.3d 267, 270 (Pa. 2010) (discussing ***Kaczkowski***, 421 A.2d at 1029 n.5, 1031, 1033-33);[2] ***see also Serhan v. Besteder***, 500 A.2d 130, 137-138 (Pa. Super. 1985). "[T]he relevant inquiry in a personal injury action is whether and to what extent the plaintiff's economic horizons have been shortened." ***Lupkin v. Sternick***, 636 A.2d 661, 664 (Pa. Super. 1994), *aff'd*, 667 A.2d 13 (Pa. 1995) (citing ***Ruzzi v. Butler Petroleum Co.***, 588 A.2d 1, 6 (Pa. 1991); ***Serhan***, 500 A.2d at 138). A plaintiff has the burden of presenting

_____

[2] In ***Kaczkowski***, our Supreme Court rejected the notion that a plaintiff's recovery of lost future earnings be limited to compensation received based upon his or her salary as of the date of the debilitating event. Rather, the ***Kaczkowski*** Court held that reliable economic data concerning the impact of injury on the victim's lost future productivity could be considered. 421 A.2d at 1038. "Productivity includes such factors as age, maturity, education, skill, and technology advances." ***Helpin***, 10 A.3d at 273 (discussing ***Kaczkowski*** at 1029 n.5, 1031, 1033-33).

"sufficient data from which the damages can be assessed with reasonable certainty." ***Kearns v. Clark***, 493 A.2d 1358, 1364 (Pa. Super. 1985) (quoting ***Gordon v. Trovato***, 338 A.2d 653, 657 (Pa. Super. 1975)). "There must be some evidence from which a jury can reasonably infer that earning power will probably be reduced or limited in the future." ***Kearns***, 493 A.2d at 1364.

In response to the pre-trial motion *in limine*, Appellees maintained that Crespo's pre-trial deposition established that he had a career as a musician and that there was sufficient evidence to present the wage loss claim to the jury based on reports of vocational and actuarial experts that proposed to testify as to Crespo's loss of potential earning capacity. ***See*** Plaintiffs' Response to Motion to Preclude Wage Loss Claim, 1/28/2016, at 3. In his deposition, Crespo had testified that he earned close to $22/hour as a musician; however, he could not specifically indicate how much he was earning on an annual basis. ***See id.***, at Exhibit D: Crespo Dep., 12/23/2013, at 19. Further, Crespo stated that he had an oral agreement with Charlie Cruz to get paid for his performances "numerous amounts of times." ***Id.*** at 21.

In addition, Appellees' expert report from their vocational expert, Dr. Robert Cipko, provided pertinent wage calculations for a musician in the Philadelphia area. ***See*** Plaintiffs' Response to Motion to Preclude Wage Loss

Claim, 1/28/2016, at 3; Exhibit B: Dr. Cipko Report, 3/23/2015, at 14.[3] Dr. Cipko opined that Crespo "cannot play chord progressions on the guitar now with just two fingers on the left hand and has lost the potential for earnings as a musician." *Id.* at 14-15.[4] Cipko's report also detailed how Crespo tried to return to truck driving but had a concern about safety "due to difficulty of operating a steering wheel." *Id.* Finally, David Hopkins, an actuary and economic expert provided further evidence that Crespo suffered a loss in earning capacity. His report estimated loss of earnings in the range of one to six million dollars. *See* Plaintiffs' Response to Motion to Preclude Wage Loss Claim, 1/28/2016, at 2, Exhibit E.

Here, Appellees presented sufficient evidence that Crespo's economic horizons had been shortened as a direct result of his injury for his wage loss claim to go to trial. *See Lupkin*, 636 A.2d at 664; *Kearns*, 493 A.2d at

---

[3] In order to calculate projected lost future income, Dr. Cipko's report compared the median, 75%, and 90% level salary for a musician in Philadelphia, in Pennsylvania, and in the United States. Exhibit B: Dr. Cipko Report, 3/23/2015, at 14. For instance, Dr. Cipko calculated lost potential earnings in terms of annual wages for a musician living in Philadelphia could range from $53,373 at the median (50%) level to $117,728 at the 90% level. *Id.*

[4] Dr. Cipko emphasized in his report that Crespo believed he could have made near $100,000 a year if he had not lost his fingers. The report concluded that Crespo had been making the equivalent to a median level musician and that his musical career was progressing upward, suggesting that his wages fell within the 90% levels of the annual wages for the city, state, and nation. *Id.* at 15.

1364.[5]  Accordingly, we discern no error of law or abuse of discretion in the trial court's denial of Appellants' pre-trial motion *in limine* to preclude the wage loss claim.  **See Parr**, 109 A.3d at 690.

## 2.    Crespo's Marijuana Use and Child Support Orders

In their second issue, Appellants contend the court erred in granting Appellee Crespo's pre-trial motion *in limine* to preclude questioning about his marijuana use and outstanding child support orders.

The threshold consideration in determining admissibility is relevance. **See** Pa.R.E. 401-402.

> Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'  Pa.R.E. 401.  'All relevant evidence is admissible, except as otherwise provided by law.'  Pa.R.E. 402. 'Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'  Pa.R.E. 403.

---

[5] Although Appellants have not preserved a claim regarding the sufficiency of the evidence presented at trial in support of the wage loss claim, we note that several witnesses testified in support of Crespo's ability to play the cuatro as a professional musician.  Specifically, Cruz and Laponte testified that Crespo performed as a musician and worked on two albums prior to his injury.  **See** N.T., Laponte, 2/3/2016, at 9-28; N.T., Cruz, 2/4/2016, 65-75. It was within the prerogative of the jury to credit this testimony and reject Appellants' suggestion that Crespo's wage loss was to any extent speculative.  **See Gillingham v. Consol Energy, Inc.**, 51 A.3d 841, 861 (Pa. Super. 2012) ("The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses.") (quoting **Samuel-Bassett v. Kia Motors America**, 34 A.3d 1, 39 (Pa. 2011)).

*Brady v. Urbas*, 80 A.3d 480, 483–84 (Pa. Super. 2013), *aff'd*, 111 A.3d

1155 (Pa. 2015).  As the issue in this case is medical malpractice, we

consider the following in applying the test for relevance.

> [T]o prevail in a medical malpractice action, a plaintiff must establish a duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm.

*Brady*, 80 A.3d at 484 (quoting **Toogood v. Owen J. Rogal, D.D.S., P.C.**,

824 A.2d 1140, 1145 (Pa. 2003) (quotation marks and citation omitted)).

According to Appellants, Crespo's medical records stated that he used

marijuana to treat "the alleged pain from the injuries to his fingers."

Appellants' Br. at 25.  They argue that "any treatment modality" for the pain

caused by the injury, including marijuana, was relevant and admissible, as it

related to Mr. Crespo's ongoing pain and suffering.  **Id**.  Appellants' claim is

without merit.

The court determined that the probative value of Crespo's marijuana

use was outweighed by the tendency of the evidence to be unfairly

prejudicial to the defense.  **See** TCO at 22.  We agree.  Crespo's marijuana

use is not relevant to any fact that is of consequence in the underlying cause

of action.  Accordingly, the trial court did not abuse its discretion in

precluding questions related to his marijuana use.  **See** Pa.R.E. 403.

Appellants also contend that the court erred in precluding questions

relating to Mr. Crespo's failure to pay child support.  According to Appellants,

- 12 -

"Crespo claimed he was making substantial money as a musician under the table in the years preceding his injury," and the child support orders provided "circumstantial evidence that his earnings were not what they were purported to be." Appellants' Br. at 25-26.

Here, the trial court found that "past support orders would risk inducing the jury to render a verdict based on emotion or contempt." TCO at 25. We agree. The court has broad discretion to exclude potentially misleading evidence based on the danger of unfair prejudice. *Gen. Equip. Mfrs. v. Westfield Ins. Co.*, 635 A.2d 173, 182 (Pa. Super. 1993); *Whyte v. Robinson*, 617 A.2d 380, 383 (Pa. Super. 1992) (citations omitted) (noting that the court may preclude evidence that has "an undue tendency to suggest a decision on an improper basis"). Moreover, Crespo's failure to pay child support neither proves nor disproves that Crespo was working or capable of gainful employment as a musician before his injury. Accordingly, the court did not abuse its discretion in granting Appellees' motion *in limine* to preclude this evidence. *See Parr*, 109 A.3d at 690.

Next, Appellants assert that the trial court abused its discretion in denying them a new trial based on several, allegedly erroneous evidentiary rulings. This Court has previously described the manner in which we review a trial court's decision to grant or deny a party's motion for a new trial.

> Consideration of all new trial claims is grounded firmly in the harmless error doctrine "[which] underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial or another

- 13 -

trial judge would have ruled differently; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1122 (Pa. 2000). Once the trial court passes on the moving party's claim, the scope and standard of appellate review coalesce in relation to the reasons the trial court stated for the action it took. *See id.* Where the court is presented with a finite set of reasons supporting or opposing its disposition and the court limits its ruling by reference to those same reasons, our scope of review is similarly limited. *See id.* at 1123. Thus, "[w]here the trial court articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the appellate court must review that reason under the appropriate standard." *Id.* (quoting *Morrison v. Com., Dept. of Pub. Welfare*, 646 A.2d 565, 571 (Pa. 1994)).

Our standard of review prescribes the degree of scrutiny we apply to the trial court's decision and the manner in which we evaluate its conclusions. *See id.* at 1122 (citing *Morrison*, 646 A.2d at 570). If the trial court's challenged ruling was one of law, we review its grant or denial of a new trial on that point to discern if the court committed legal error. *See id.* at 1123. Similarly, if the challenged ruling involved a discretionary act, we review the disposition of the new trial motion relative to that act for abuse of discretion. *See id.* "Discretion must be exercised on the foundation of reason." *Id.* Accordingly,

> [a]n abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it would have reached a different result than the trial court does not constitute a finding of an abuse of discretion.

*Id.* (quoting *Morrison*, 646 A.2d at 570). "Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion." *Id.*

*Rettger v. UPMC Shadyside*, 991 A.2d 915, 923–24 (Pa. Super. 2010).

In reviewing Appellants' evidentiary claims, we apply the following

standard in assessing the trial court's underlying ruling.

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. Thus[,] our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Hawkey v. Peirsel*, 869 A.2d 983, 989 (Pa. Super. 2005) (quoting *Turney Media Fuel, Inc., v. Toll Bros.*, 725 A.2d 836, 839 (Pa. Super. 1999) (citations omitted)). We consider each challenged ruling in turn.

**3.    Fact Witnesses**

In their third issue, Appellants contend that the "court abused its discretion when it permitted 'fact witnesses,' Dr. McClellan, Charlie Cruz, and David Laponte to offer expert opinions at trial."  1925(b) Statement at 1. According to Appellants, this testimony violated discovery rules governing the use of experts in medical malpractice cases.

Upon our review of the post-trial motion, we conclude that Appellants have sufficiently preserved this issue with respect to Dr. McClellan and to Cruz.  *See* Post Trial Motion, 2/22/2016, at 2, 3 (issues numbered 2 and 6). "Pa.R.Civ.P. 227.1 requires parties to file post-trial motions in order to preserve issues for appeal.  If an issue has not been raised in a post-trial motion, it is waived for appeal purposes." *Diamond Reo Truck Co. v. Mid-Pacific Indus.,* 806 A.2d 423, 428 (Pa. Super. 2002) (quoting *L.B. Foster Co. v. Lane Enterprises,* 710 A.2d 55 (Pa. 1998) (citations omitted)).

Appellants waived any claim with regard to Laponte's testimony by failing to raise it in their post-trial motion.

Appellants argue that testimonies of Dr. McClellan and Cruz exceeded the scope of Pennsylvania Rule of Evidence 701, which states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

A. **Dr. McClellan**

According to Appellants, Dr. McClellan rendered an expert opinion on causation even though he was not identified as an expert. *See* Appellants' Br. at 10-12 (citing in support Pa.R.C.P. 4003.5 (requiring pre-trial disclosure of experts and expert reports "acquired or developed in anticipation of litigation or for trial"); *Sindler v. Goldman*, 454 A.2d 1054, 1057 (Pa. Super. 1982) (recognizing that compliance with Rule 4003.5 is critical to prevent unfair surprise)).

Dr. McClellan is a physician specializing in plastic and reconstructive hand surgery and wound healing with whom Crespo had seventeen office visits. *See* N.T., McClellan, 2/2/2016, 19. Dr. McClellan performed the surgical amputation of his fingers. *See id.* On direct examination, counsel

asked Dr. McClellan to clarify a note on his medical records regarding the cause of devitalization in Crespo's fingers. *See id.* at 28. Dr. McClellan testified, over Appellants' objection, that "[he] felt that the treatment rendered previously and the acid caused these injuries." *Id.*

Appellants maintain that this testimony was highly improper and prejudicial as it related to the standard of care and causation at issue in the trial and was not related to the treatment rendered by Dr. McClellan to Crespo. *See* Appellants' Br. at 12. Appellants' argument is without merit.

Here, the trial court found Dr. McClellan qualified to comment as a fact witness on causation because his testimony was based on his observations, diagnosis, and medical judgment at the time he rendered treatment to Crespo. *See* TCO at 10. We agree.

"[T]echnical expertise does not *ipso facto* convert a fact witness, who might explain how data was gathered, into an expert witness, who renders an opinion based on the data." *Deeds v. Univ. of Pennsylvania Med. Ctr.*, 110 A.3d 1009, 1017 (Pa. Super. 2015), reargument denied (Apr. 7, 2015), *appeal dismissed sub nom.*, 128 A.3d 764 (Pa. 2015) (quoting *Branham v. Rohm & Haas Co.*, 19 A.3d 1094, 1110 (Pa. Super. 2011)). "Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness's perceptions and helpful to a clear understanding of his or her testimony." *Id.* (quoting *Brady by Brady v. Ballay*, 704 A.2d 1076, 1082 (Pa. Super. 1997)).

In this instance, Dr. McClellan was asked to clarify his own notes on medical records that he made at the time of rendering treatment to Crespo as his treating physician. Because Dr. McClellan's opinions were not developed in anticipation of litigation, Rule 4003.5 does not apply. ***See, e.g., Miller v. Brass Rail Tavern***, 664 A.2d 525, 531-32 (Pa. 1995) (noting that, under Pa.R.C.P. 4003.5, the rule of preclusion for failing to identify experts applies only where the expert opinions were formulated "in anticipation of litigation or for trial"). Accordingly, Appellants' argument is without merit, and we discern no abuse of the trial court's discretion.

B. **Cruz**

Next, Appellants contend that the court erred in permitting Cruz to render expert opinions regarding Crespo's pre-injury and post-injury skill as a musician. They argue that this testimony exceeded the scope of Pa.R.E. 701 because the "average lay person is unlikely to know anything about the Latin music business and/or the cuatro guitar, let alone what someone who plays the cuatro guitar would be expected to earn." Appellants' Br. at 14-15. According to Appellants, Appellees' failure to provide notice of such expert testimony prevented them from retaining an expert in the music industry to rebut their opinions. Appellants' argument is not persuasive.

On appeal, Appellants cite generally to a large portion of the notes of testimony in the reproduced record. ***See*** Appellants' Br. at 13 (referencing parts of Cruz's direct and redirect examination N.T., <u>Cruz</u>, at 4-16, and 61-

68). From what we can glean from the notes of testimony, the trial court overruled objections to Cruz's testimony about what he paid Crespo and what he would have paid Crespo if Crespo had not been injured because it was within his general knowledge and did not require special expertise for the jury to understand. *See* N.T., 2/4/2016, at 10-11. As a fact witness, the court found that Cruz was "qualified and capable of making a determination as to who he would and wouldn't hire." *Id.* at 9. Appellees maintain that this testimony was factual in nature and limited to personal observations. *See* Appellees' Br. at 17. We agree. *See Deeds*, 110 A.3d at 1018.

Further, Appellants' reliance on Rule 4003.5 and *Sindler* to support this argument is misplaced. After reviewing the record, it is clear that Cruz testified regarding his personal relationship with Crespo. Moreover, Cruz did not develop his opinions in anticipation of litigation. Accordingly, Appellants' argument is without merit. We discern no abuse of the trial court's discretion.

**4. Precluding Testimony regarding Pathology Report**

In their fourth issue, Appellants contend that the court erred when it precluded Dr. Lozano and Appellant Dr. Hughes from commenting on a pathology report ordered by Dr. McClellan. *See* Appellants' Br. at 22. Appellants baldly assert that preclusion of this testimony caused significant prejudice.

However, Appellants' post-trial motion preserved a singular issue claiming that Dr. McClellan rendered an expert opinion without providing a pre-trial report in violation of Pa.R.C.P. 4003.5. In the same issue, Appellants alleged that the "court then compounded the error by prohibiting [Appellant] Hughes as well as [Appellants'] expert, Dr. Lozano, from addressing … the pathology report from Dr. McClellan's surgery." Post Trial Motion, 2/22/2016, at 2. In ruling on the post-trial motion, the trial court did not recognize or address the pathology report rulings as a separate issue. Moreover, Appellants fail to cite relevant authority in support of their claim. *See* Pa.R.A.P. 2118. Upon review of the record, we deem this issue waived based on Appellants' failure to preserve this as a separate issue in their post-trial motion. ***See Diamond Reo Truck Co.***, 806 A.2d at 428.[6]

_____

[6] Notwithstanding waiver, we discern no abuse of discretion. When Dr. McClellan amputated Crespo's fingers, he removed soft tissue and sent it to a pathology department for analysis. *See* N.T., McClellan, 2/2/2016, 19. The report revealed destruction of soft tissue and clumps of calcium. *See id.* at 19, 37. In sustaining Appellees' objection to Dr. Hughes testimony regarding the pathology report, the court found that Appellees were not patients of Dr. Hughes' at the time of Dr. McClellan's treatment. *See* N.T., Hughes, 2/3/2016, at 23-24; TCO at 19. The court found that Appellants had failed to properly frame the question and lacked a proper foundation for Dr. Hughes to comment on a pathology report prepared by another witness. *See* TCO at 20 (noting, specifically, that Appellants "failed to establish that Dr. Hughes had formed his opinions about the pathology report prior to litigation"); *see* Pa.R.Civ.P. 4003.5. Appellants did not attempt to raise the pathology report with Dr. Lozano until redirect examination. The court sustained Appellees' objection because the pathology report was beyond the scope of direct or cross-examination. *See* N.T., Lozano, 2/8/2016, at 97-98. Based upon the reasons stated by the court, we discern no abuse of discretion. *See **Rettger***, 991 A.2d at 923-24 (citing ***Harman***, *supra*).

**5.**    **Appellees' Standard of Care Expert - Dr. Mosier**

In their fifth issue, Appellants contend that the court erred in allowing Appellees' standard of care expert, Dr. Mosier, to testify outside of the scope of his pretrial report. Appellants' Br. at 28.   According to Appellants, Dr. Mosier added a new theory that was not contained in his pretrial report – "namely that Dr. Hughes was negligent because he violated a Temple Policy on the amount of calcium gluconate" to administer.   ***Id.***   Once again, Appellants rely on 4003.5(c), which states, in relevant part:

> To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto.  However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.C.P. No. 4003.5(c).

The trial court found that Appellants had waived this issue by failing to assert an objection to Dr. Mosier's testimony covering the TUH policy.   ***See*** TCO at 21.   Appellants lodged an objection to Dr. Mosier's commentary regarding his testimony about the policy to the extent it was not in his

report.[7]    Over Appellants' objection, Dr. Mosier testified that he reviewed Appellants' discovery responses, which included TUH's policies, and that he relied on the policies in forming his conclusions regarding the subject matter of his report.    **See** N.T., Mosier, 2/1/2016, at 18.    Over Appellants' objection, the court permitted Appellees to publish the TUH policies for the jury.    **See id.** at 19.    Subsequently, Dr. Mosier stated his conclusion that TUH personnel administered twice the amount of calcium gluconate as stated in the TUH policies.    **See** N.T., Mosier, 2/1/2016, at 20.

Upon review of the record, we deem this issue as properly preserved at trial.    Nevertheless, as noted by the trial court, because Dr. Mosier relied upon the policies in reaching his conclusions, the trial court properly overruled Appellants' objections.    **See** TCO at 21.    We discern no abuse of discretion.    Accordingly, Appellants' claim is without merit.

## 6.    Appellants' Psychiatric Expert, Dr. Toborowsky

In their sixth issue, Appellants contend that the court erred in limiting the anticipated testimony of their psychiatric expert, Dr. Toborowsky.    **See** Appellants' Br. at 26.    According to Appellants, Crespo advised Dr. Toborowsky that he had a number of psychological stressors that

_____

[7] Appellees argue that there was no objection lodged on the record when they introduced the policy and it was published to the jury.    **See** Appellees' Br. at 28-29.    The record indicates that the defense objection did occur when the proponent asked to publish the record; a sidebar discussion ensued and the court overruled the objection.    **See** N.T., Mosier, 2/1/2016, at 19.

contributed to, *inter alia*, post-traumatic stress disorder and major depressive disorder. **Id.** They maintain that the trial court's limitation on Dr. Toborowsky's testimony led the jury to believe that "the only significant stressor in Mr. Crespo's life was the injury to his fingers [when] that was [not] the sole cause of his mental state." **Id.** at 27.

The trial court made a pre-trial ruling that precluded Dr. Toborowsky from testifying about "Crespo's history of molestation at the hands of his uncle" before the jury. TCO at 23; **see also** N.T., Toborowsky, 2/9/2016, at 21. The court found that this abuse was: remote in time in comparison to the loss of fingers; overly prejudicial due to the nature of the subject matter; and far more prejudicial than probative. TCO at 24.[8] We agree. The court has broad discretion to exclude evidence where it finds that its probative value is outweighed by unfair prejudice or needless presentation of cumulative evidence. **Brady**, 80 A.3d at 484; **see also** Pa.R.E. 403. Accordingly, the court did not abuse its discretion in limiting Dr. Toborowsky's testimony.

## 7.   Cross-examination of Dr. Hughes

In their seventh issue, Appellants contend that the court erred in

---

[8] Further, the court opined that the evidence was unnecessarily cumulative, finding Appellants sufficiently raised Crespo's pre-existing psychological stressors through other evidence. TCO at 24 (citing N.T., 2/3/2016, Terio, at 19).

permitting cross-examination of Appellant Dr. Hughes with scientific literature from 2015, when the events in question occurred in 2011. ***See*** Post Trial Motion, 2/22/2016, at 3; 1925(b) Statement at 1; Appellants' Br. at 23. According to Appellants, the article constituted hearsay and it was erroneous for the court to permit Dr. Hughes to read the article into evidence. ***Id.*** (citing in support ***Majdic v. Cincinnati Machine Co.***, 537 A.2d 334, 339 (Pa. Super. 1988) (*en banc*); ***Burton-Lister v. Siegel, Sivitz and Lebed Assocs.***, 798 A.2d 231 (Pa. Super. 2002)).

The trial court found that Dr. Hughes' testimony laid sufficient foundation for authentication of the article as a treatise. According to the court, it permitted "a judicious question from [Appellees] regarding the content of the treatise on the topic of standard of care for treatment of hydrofluoric acid exposure." TCO at 19. Here, the record reflects that questioning regarding the contents of the treatise was complemented by the court overruling several of Appellants objections. Appellant Dr. Hughes was cross-examined by Appellees regarding a 2015 medical publication called "Up-to-Date." The court overruled Appellants' objection to Dr. Hughes reading from the text of the article during cross-examination. ***See*** N.T., Hughes, 2/2/2016, at 42. The text stated that "Injection into the digits is NOT recommended." ***Id.*** The court allowed Appellees to offer the text into evidence by asking Dr. Hughes to read directly from the article, including the emphasis on capitalization of the word "not." ***Id.*** The article stated an opinion on the standard of care adverse to that held by Dr. Hughes.

Instantly, we note that the trial court erroneously relied on the federal standard of authentication of learned treatises.[9] In this Commonwealth, Pennsylvania Courts adhere to the common law rule as articulated by our Supreme Court in **Aldridge v. Edmunds**, 750 A.2d 292, 297 (Pa. 2000):

> While other jurisdictions, including the federal courts, have moved away from the common law exclusion in favor of an exception permitting the admission of treatise materials as substantive evidence on a limited basis, **see, e.g.**, F.R.E. 803(18), Pennsylvania has not done so. **See** Pa.R.E. 803(18) (providing that 'Pennsylvania does not recognize an exception to the hearsay rule for learned treatises' (citing **Majdic**, 537 A.2d at 334)).

**Aldridge**, 750 A.2d at 297.[10]  "As the appellate courts of this

_____

[9] As Appellees observe, Dr. Hughes conceded that the publication "Up-to-Date" probably contained information that he considered reasonably reliable. N.T., Hughes, 2/2/2015, at 38, 43.  However, the trial court's 'adequate foundation' reasoning applies to the hearsay exception for a learned treatise found in the more liberal federal rules, which this Court and this Commonwealth have expressly declined to adopt. **See Majdic**, 537 A.2d at 340; **see, e.g.,** F.R.E. 803(18).  "Our evidentiary rules … permit limited use of treatises on cross-examination for impeachment, and this Court has not foreclosed the possibility that there may be other valid, nonhearsay purposes that may support the proffer of treatise materials." **Aldridge v. Edmunds**, 750 A.2d 292, 299 n.4 (Pa. 2000) (internal citations omitted); **see, e.g., Cummings v. Borough of Nazareth**, 242 A.2d 460, 466 (Pa. 1968) (plurality opinion) ("It is entirely proper in examination and cross-examination for counsel to call the witness's attention to published works on the matter which is the subject of the witness's testimony.").

[10] **See, e.g., Klein v. Aronchick**, 85 A.3d 487, 501 (Pa. Super. 2014), *appeal denied*, 85 A.3d 487 (Pa. 2014) (explaining the common law assumes a lay jury may be confused by the technical nature of the information and therefore place undue emphasis upon or misapply scientific information contained in a learned treatise) (citing **Aldridge**, 750 A.2d at 296-97).

Commonwealth have consistently noted, '[l]earned writings which are offered to prove the truth of the matters therein are hearsay and may not properly be admitted into evidence for consideration by the jury.'" *Burton-Lister*, 798 A.2d at 239 (quoting *Majdic*, 537 A.2d at 339).

On cross-examination, a fact-witness may be questioned with respect to any publication in the field that he considers generally reliable and the evidence is admissible to challenge the witness's credibility, but the writing cannot be admitted for the truth of the matter asserted. *Majdic*, 537 A.2d at 339.

> Excerpts from a publication which are read into evidence for the purpose of proving the truth of the statements contained therein are still hearsay and, therefore, inadmissible. This fact is not changed merely because the document is read into evidence by the witness instead of being received as an exhibit for inspection by the jury. It is the purpose for which the information is offered, not the manner in which is introduced, which makes it objectionable.

*Id.* at 340 (holding trial court did not err by prohibiting expert witness from reading contents of treatises into evidence and by not admitting treatises into evidence).

Upon a party's request, the trial court shall issue appropriate limiting instructions to ensure that the inadmissible hearsay does not come in for substantive purposes and that the treatise does not become the focus of cross. *Aldridge*, 750 A.2d at 297 (citing Pa.R.E. 105 ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court upon request

shall, or on its own initiative may, restrict the evidence to its proper scope and instruct the jury accordingly.")).  It remains to be determined, however, "whether the [a]ppellants are entitled to a new trial, as an erroneous evidentiary ruling will generally require reversal only if it caused prejudice." *Aldridge*, 750 A.2d at 298 (holding that erroneous admission of hearsay did not prejudice results of trial so as to require reversal).  A trial court's failure to limit the use of treatises effectively may constitute grounds for reversal only if the issue was properly preserved at all stages of the proceedings and prejudice can be established*.  See Klein*, 85 A.3d at 505 (Pa. Super. 2014) (Fitzgerald, J., concurring in part and dissenting in part) (citing *Aldridge*, 750 A.2d at 298).

In support of their argument, Appellants rely upon *Burton-Lister*, in which this Court considered a litigant's failure to make a specific objection to the impermissible reading of an article and failure to request a specific limiting instruction for the jury dispositive to preserving the issue on appeal. *Burton-Lister*, 798 A.2d at 239-40.  Similarly, Appellants failed to request any instruction to limit the jury's consideration of the treatise to the proper purpose for impeachment of Dr. Hughes.  *See id*.  Accordingly, we deem this matter waived and we need not reach the issue of prejudice.[11]  *Burton-*

---

[11] Here, the parts of the text which Dr. Hughes read into evidence supported Appellees' theory that the manner or amount of injection ordered by Dr. Hughes did not comport with the standard of care.  Conversely, the text was not used to clarify the basis for Dr. Hughes' opinion, but rather as the means

*(Footnote Continued Next Page)*

*Lister*, 798 A.2d at 239-40 (failure to make specific objection *and* request limiting instructions rendered the issue waived); *see also Aldridge, surpa*.

**8.    *Crimen falsi*: Cross-Examination and Juror Instruction**

In their eighth issue, Appellants contend that the trial court erred in precluding cross-examination of Mr. Crespo with the transcript of his guilty plea in 2013 to the charge of receiving stolen property (RSP).  **See** Appellants' Br. at 17-18.  Appellants maintain that the ruling was prejudicial because Crespo "explain[ed] away the crime committed as one big misunderstanding despite substantial evidence to the contrary."  Appellants' Br. at 18.  Further, Appellants maintain that the trial court's refusal to give a *crimen falsi* juror instruction was prejudicial.

In reviewing jury instructions, we must determine whether an omission or inaccurate statement of law amounts to a fundamental error controlling the outcome of the case.  ***Tincher v. Omega Flex, Inc.***, 104 A.3d 328, 335 (Pa. 2014).  "This Court will afford a new trial if an erroneous jury instruction amounted to a fundamental error or the record is insufficient

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

by which opinion evidence on the standard of care was impermissibly conveyed to the jury to prove the truth of its contents. **See, e.g., Klein v. Aronchick**, 85 A.3d 487, 504 (Pa. Super. 2014) (finding that trial court abused its discretion in allowing appellees' extensive cross-examination concerning learned treatises and in admitting such impermissible hearsay into evidence).  Moreover, the trial court failed to assure, pursuant to **Aldridge** and its progeny, that the use made of the publication was "judicious" or "limited" in nature. **Burton-Lister**, 798 A.2d at 239 (quoting **Aldridge**, 750 A.2d at 298).

to determine whether the error affected the verdict." ***Id.***

Pennsylvania Rule of Evidence 609 governs impeachment of a witness's credibility with evidence of *crimen falsi*:

>   (a)   **In General.**  For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere* must be admitted if it involved dishonesty or false statement.

Pa.R.Evid. 609(a); ***see Russell v. Hubicz***, 624 A.2d 175, 181-182 (Pa. Super. 1993), *appeal denied*, 624 A.2d 175 (Pa. 1993) (noting that the rule applies in both civil and criminal cases where the conviction or date of imprisonment occurred within ten years of testimony) (quoting ***Commonwealth v. Randall***, 528 A.2d 1326, 1329 (Pa. 1987)).  Receiving stolen property is among the crimes involving dishonesty or a false statement that are admissible for the purpose of impeaching any witness's credibility under Rule 609.  ***Allen v. Kaplan***, 653 A.2d 1249, 1253 (Pa. Super. 1995) (citing Leonard Packel and Anne Poulin, Pennsylvania Evidence § 609 (1987 and Supp. 1994)).

On February 21, 2014, Appellee Crespo entered a negotiated guilty plea to one count of receiving stolen property, arising out of his purchase of a 2010 Mercedes-Benz C300 from a "chop shop" under circumstances where Crespo knew or should have known that the vehicle was stolen.  ***See Commonwealth v. Crespo***, 5264 C.R. 2013 (Dauphin Cty. CCP 2/21/2014), Transcript of Proceedings: Guilty Plea and Sentencing.  At trial,

Crespo testified about the RSP conviction on direct examination. *See* N.T., Crespo, 2/4/2016, at 35-36. However, the trial court precluded Appellants from cross-examining Crespo regarding the circumstances surrounding his conviction and from introducing the transcript from the guilty plea hearing. The trial court reasoned that Crespo had acknowledged the circumstances on direct. Further, the court found that the subject of cross "did not sound in impeachment of Crespo's truthfulness as a witness, but [rather] presented … a collateral attack on a specific year of the wage-loss claim." TCO at 17.[12]

This was clear error by the trial court. Here, Crespo's 2014 conviction for receiving stolen property is *crimen falsi* that is *per se* admissible under Pa.R.Evid. 609. *See Allen*, 653 A.2d at 1253. Moreover, upon a party's request for a *crimen falsi* jury instruction following such evidence, the court should instruct the jury regarding its relevancy and the use of which the jury

_____

[12] It appears that the trial court and Appellants misconstrue the sentence imposed subsequent to his conviction for receiving stolen property. *See* TCO at 18 (noting that circumstances such as the duration of Crespo's incarceration "around one year" was irrelevant). According to Appellants, Crespo "spent approximately one (1) year incarcerated at Graterford Prison." Appellants' Br. at 17. Upon review of the record, Appellant was arrested on September 9, 2013. His deposition took place at Graterford SCI on December 23, 2013. In January 2014 upon consideration of Appellants' motion for extraordinary relief from discovery deadlines, the court placed this case on deferred status pending Appellant's release. *See* Order, 1/31/2014. On February 21, 2014, Appellant pleaded guilty to receiving stolen property and was sentenced to twelve months supervisory probation. *See Commonwealth v. Crespo*, 5264 C.R. 2013 (Dauphin Cty. CCP 2/21/2014), N.T. at 6. The remaining charges were withdrawn. The exact length of the duration of Crespo's incarceration is uncertain or unknown.

can make of it in determining the witness's credibility. ***See Commonwealth v. LaMassa***, 532 A.2d 450, 452 (Pa. Super. 1987). Despite the request for a *crimen falsi* instruction, the court refused to instruct the jury as required, thus compounding the violation of Rule 609. ***See*** N.T., Points for Charge, 2/9/2016, at 24-25; ***but see LaMassa***, 532 A.2d at 452.

Clearly, Crespo's testimony controlled the outcome of his claims for damages. His testimony was instrumental in establishing not only his status as a musician before the accident and his lost earning capacity after the accident, but also the severity of his injury, *i.e.* his pain and suffering. Thus, the court's erroneous rulings directly and adversely impacted Appellants' ability to challenge the credibility of Crespo's damages claims. We must determine whether Appellants are entitled to a new trial limited to damages.

> Pennsylvania and most other jurisdictions have adopted a rule permitting such limited new trials under certain specific circumstances. A new trial limited to the issue of damages will be granted where: (1) the issue of damages is not "intertwined" with the issue of liability; and (2) where the issue of liability has been "fairly determined" or is "free from doubt."

***Stapas v. Giant Eagle***, 153 A.3d 353, 365 (Pa. Super. 2016) (quoting ***Kiser v. Schulte***, 648 A.2d 1, 8 (Pa. 1994) (internal citations omitted)).

This is not a case in which the issue of damages is intertwined with the issue of liability and the issue of liability is free from doubt based on the record. ***Kiser***, 648 A.2d at 8. It is fair here to both parties to limit the new trial to the specific issues of damages. ***See id.*** Accordingly, we reverse the

damages awarded for Crespo's noneconomic and wage loss claims, and remand for a new trial limited to determining damages, permitting cross-examination of Crespo regarding his prior conviction and juror instruction regarding the impeaching effect of his prior conviction.[13]

**9.    Denial of Motion for Remittitur of Noneconomic Damages**

Finally, Appellants contend that the trial court erred in denying their motion for remittitur.

> Our standard of review in reversing an order denying a remittitur by a trial court is confined to determining whether there was an abuse of discretion or an error of law committed in such denial.
> …
> The grant or refusal of a new trial because of the excessiveness of the verdict is within the discretion of the trial court.  This [C]ourt will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice.  We begin with the premise that large verdicts are not necessarily excessive verdicts.  Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive.

*Tindall  v.  Friedman*, 970  A.2d  1159,  1176-77  (Pa.  Super.  2009), *reargument denied*, (quoting *Gbur v. Golio*, 932 A.2d 203, 212 (Pa. Super. 2007), *aff'd*, 963  A.2d  443  (Pa.  2009)  (internal  citations  omitted)).

---

[13] On remand, the court may balance the prejudicial effect of Crespo's incarceration with the relevance it has to his wage loss claim.  **See** Pa.R.E. 403.  Upon a party's request for a special verdict pursuant to 42 Pa.R.C.P. 1042.71, the trier of fact shall make a determination with separate findings the amount of past and future damages according to the formula provided by 40 P.S. § 1303.509 (differentiating past damages for lost earnings and future damages for loss of earning capacity).

Moreover, this Court is reluctant to reverse a jury verdict that bears a reasonable resemblance to the damages proven. *McManamon v. Washko*, 906 A.2d 1259, 1285 (Pa. Super. 2006), *appeal denied*, 906 A.2d 1259 (Pa. 2007).[14]

In addition, this Court has enumerated a number of factors to consider when determining whether a jury's verdict is excessive:

> (1) the severity of the injury; (2) whether the plaintiff's injury is manifested by objective physical evidence or whether it is only revealed by the subjective testimony of the plaintiff ([*e.g.*] where the injury is manifested by broken bones, disfigurement, loss of consciousness, or other objective evidence, the courts have counted this in favor of sustaining a verdict); (3) whether the injury will affect the plaintiff permanently; (4) whether the plaintiff can continue with his or her employment; (5) the size of the plaintiff's out-of-pocket expenses; and (6) the amount plaintiff demanded in the original complaint.

*Gbur*, 932 A.2d at 212 (internal citations omitted).

According to Appellants, the award of noneconomic damages was excessive and must be remitted in accordance with Pa.R.C.P. 1042.72(c). *See* Appellants' Br. at 28-29 (stating that non-economic damages "deviate substantially from what could be considered reasonable compensation and are so excessive as to shock the conscience"). However, Pa.R.C.P. 1042.72

---

[14] "There are four items that make up a damage award for noneconomic loss, both past and future: (1) pain and suffering; (2) embarrassment and humiliation; (3) loss of ability to enjoy the pleasures of life; and (4) disfigurement." Pa.R.C.P. 223.3. Further, "Pennsylvania law allows compensation for loss of life's pleasures as a component of pain and suffering." *McManamon*, 906 A.2d at 1281.

was rescinded in its entirety effective immediately on October 17, 2012. Accordingly, we find this claim waived for lack of proper development.

Nevertheless, we briefly note the following. Appellants allege that there is no evidence that Appellee Torralvo suffered an injury. *See* Appellants' Br. at 29. To the contrary, as recognized by the trial court, the jury considered substantial evidence of an injury. *See* TCO at 27-28. For example, Torralvo testified that his right index finger was repeatedly injected and that the injections caused his fingers to blister, change colors, and experience significant pain and cold sensations. *See id.* (citing testimony). The jury also saw photos of Torralvo's finger, which depicted the black portion of his finger that had to be surgically removed due to necrosis. *See id.* The evidence established Torralvo had permanent disfigurement. *Id.* Toralvo also complained of ongoing pain and difficulty in cutting his fingernails to the jury. *See* N.T., Torralvo, 2/4/2016, at 49; N.T., McClellan, 2/2/2016, at 23-24. Accordingly, the court did not abuse its discretion in determining that Torralvo's award for pain and suffering was not so excessive as to shock the conscience. *See Gbur*, *surpa*.[15]

Judgment affirmed in part relating to the damages awarded to Torralvo, reversed in part, and remanded for a new trial to determine Crespo's noneconomic and economic damages. Jurisdiction relinquished.

---

[15] Because we are reversing and awarding a new trial with respect to Crespo's damages, we need not address this aspect of Appellants' claim.

- 34 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/18/2017