J-A28033-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| MADELINE KERI, PERSONAL REPRESENTATIVE OF THE ESTATE OF VELMA KERI | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : | |
| v. | : : : | No. 1774 WDA 2019 |
| CONEMAUGH VALLEY MEMORIAL HOSPITAL, LAUREL GROUP ANESTHESIA, P.C., AND MOHAN K. NAMA, M.D. | : : : : : | |

Appeal from the Judgment Entered November 4, 2019
In the Court of Common Pleas of Cambria County Civil Division at No(s):
2013-2389

BEFORE:  OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:          **DATE:  March 23, 2021**

Madeline Keri (Appellant), personal representative of the Estate of Velma Keri (Decedent), appeals from the judgment entered in the Cambria County Court of Common Pleas, following a jury verdict in favor of Conemaugh Valley Memorial Hospital (Hospital), Laurel Group Anesthesia, P.C. (Laurel Group), and Mohan K. Nama, M.D. (Dr. Nama) (collectively Appellees), in this medical malpractice action.  Appellant contends the trial court abused its discretion when it limited and/or excluded her use of two learned treatises for cross-examination purposes, and excluded the testimony of a proposed witness.  For the reasons below, we affirm.

The facts underlying this appeal are as follows. On July 19, 2011, Decedent fell in her home and broke her right hip. N.T., 7/11/19, at 186. At the time, she was 83 years old and weighed approximately 110 pounds. N.T., 7/15/19, at 116. The next day, July 20th, Decedent underwent successful surgery at Hospital to repair her hip. N.T., 7/11/19, at 30, 187. Dr. Nama was Decedent's anesthesiologist. N.T., 7/12/19, at 43.[1] Following surgery, Decedent was moved to a recovery unit. N.T., 7/15/19, at 123-24. Later, recovery unit Nurse Lisa Kozuch noted that Decedent was "crying complaining of pain to right hip." N.T., 7/12/19, at 63. Nurse Kozuch called Dr. Nama for permission to administer pain medication to Decedent. *Id.* at 60; N.T., 7/15/19, at 124-25. Dr. Nama approved giving Decedent up to two milligrams of Dilaudid, a hydromorphone, in two doses. N.T., 7/15/19, at 126. The first dose of one milligram of Dilaudid was administered at 7:25 PM, and the second one milligram dose was administered twenty minutes later. N.T., 7/12/19, at 59. Shortly thereafter, Decedent went into cardiac arrest. N.T., 7/15/19, at 136, 139. She was eventually resuscitated and transferred to an Intensive Care Unit, where she remained on a ventilator. *Id.* at 152. She underwent a

---

[1] The certified record includes two volumes of testimony dated July 12, 2019, memorializing different parts of the trial proceedings that day. The cover page of one volume bears the description, "Excerpt of Proceedings: Testimony of Pamela Vranich," whereas the cover page of the other has no corresponding description. Our citations to the July 12, 2019, transcript are to the volume lacking a cover page-description. For ease of review, we further describe this volume as including the testimony of Julianne Keri, Dr. Nama (called by Appellant as if on cross-examination), Madeline Keri, and Lisa Kozuch. *See* N.T., 7/12/19, at 2.

tracheostomy on July 29th. Appellant's Complaint, 10/25/13, at ¶ 31. Decedent was hospitalized until November 7, 2011, when she was transferred to a skilled nursing care center where she remained until she returned home on January 2, 2012. *Id.* at ¶ 34; N.T., 7/11/19, at 48.

Decedent initiated this medical malpractice action by writ of summons issued on July 24, 2013. She subsequently passed away on September 12, 2013. Appellant filed a suggestion of death on October 23, 2013, and a complaint on October 25th, asserting claims for wrongful death and survival on behalf of the estate. The case proceeded to a jury trial commencing on July 10, 2019. During the course of trial, Appellant sought to cross-examine Appellees' witness with information contained in two "learned treatises." The court precluded reference to one publication, and restricted Appellant's use of the other. In addition, the court limited the testimony of one of Appellant's fact witnesses.

On July 17, 2019, the jury returned a verdict for Appellees, concluding they were not negligent in their care and treatment of Decedent. Verdict Slip, 7/17/19, at 1. Appellant filed a timely post-trial motion for a new trial, which the trial court denied on October 3, 2019. Thereafter, Appellant filed a *praecipe* for the entry of judgment on November 4th, followed by this timely appeal on November 27th.[2]

_____

[2] Appellant complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

- 3 -

Appellant raises the following issues on appeal:[3]

[1] Did the trial court abuse its discretion when it disallowed [Appellant's] use of the "Up[T]o[D]ate" publication to impeach [the defense] expert['s] opinion on causation, on the basis that it was neither a "learned treatise" nor contained information that antedated [Decedent's] surgery?

[2] Did the trial court unfairly restrict [Appellant's] use of the [Pennsylvania Patient Safety Authority (PPSA)] article to impeach Dr. Nama, when Dr. Nama implied during the examination that he agreed with **some** of the dosage information in the article?

[3] Should the trial court have offered a limiting instruction to the jury rather than restrict [Appellant's] use of the "PPSA" article to impeach [the defense] expert['s] opinion on causation, where the article expressly contradicts [the expert's] opinion that [Decedent] received an "appropriate" dose of Dilaudid?

[4] Did the trial court abuse its discretion to exclude the testimony of respiratory therapist Carl Kenyon on the basis of a pre-trial order dated May 9, 2019 when such statement was otherwise admissible under Pa.R.E. 803(4)?

Appellant's Brief at 3.

Appellant's claims challenge the trial court's denial of her motion for a new trial. "Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion." ***Pledger by Pledger v. Janssen Pharm., Inc.***, 198 A.3d 1126, 1138 (Pa. Super. 2018) (citation and footnote omitted), *appeal denied*, 217 A.3d 179 (Pa. 2019).

"An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious,

_____

[3] We have reordered Appellant's claims for purposes of disposition.

has failed to apply the law, or was motivated by partiality, prejudice, bias or ill-will."

***Burton-Lister v. Siegel, Sivitz & Lebed Assocs.***, 798 A.2d 231, 238 (Pa. Super. 2002) (citation omitted).  Moreover, rulings concerning the admission or exclusion of evidence, as well as the scope of cross-examination, lie within the sound discretion of the trial court.  ***See Crespo v. Hughes***, 167 A.3d 168, 181 (Pa. Super. 2017) (citation omitted); ***Jacobs v. Chatwani***, 922 A.2d 950, 965 (Pa. Super. 2007) (citation omitted).

> Thus[,] our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law.  To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

***Crespo***, 167 A.3d at 181 (citation omitted).

Appellant's first three issues concern the trial court's restriction of her use of two "learned treatises," which, she contends, were relevant to impeach the credibility of both Dr. Nama and his expert anesthesiologist, Dr. Richard Stypula.

> A "learned treatise" is any textbook, published work, or periodical that has been accepted as authoritative or as reliable authority by members of a specific professional community.  Under Pennsylvania law, **the contents of a learned treatise** offered at trial to establish principles or theories **is inadmissible hearsay**, an extrajudicial declaration offered to prove the truth of the matter asserted.  Experts may rely on authoritative publications in formulating their opinions, and, to a limited extent, our courts permit experts to briefly reference materials to explain the reasons underlying their opinions.  **While such materials are not admissible, an expert may be impeached with statements contained in a text or publication deemed authoritative or reliable by him or other experts in the same field.**

- 5 -

***Charlton v. Troy***, 236 A.3d 22, 38–39 (Pa. Super. 2020) (emphases supplied and citations omitted). This Court has held that when a "learned treatise" is used in such a manner, it is "not admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion and the weight to be accorded thereto." ***Majdic v. Cincinnati Mach. Co.***, 537 A.2d 334, 339 (Pa. Super. 1988) (*en banc*) (citation omitted). ***See also Aldridge v. Edmunds***, 750 A.2d 292, 296-97 (Pa. 2000) (noting that Pennsylvania has not followed other jurisdictions, including the federal courts, which permit "the admission of treatise materials as substantive evidence on a limited basis").

In her first issue, Appellant argues the trial court abused its discretion when it precluded her from impeaching Drs. Nama and Stypula with the online publication "UpToDate." Appellant's Brief at 15. Dr. Martin Dauber, Appellant's expert anesthesiologist, explained that UpToDate is an "online medical resource available to physicians which contains . . . relevant, mostly overwhelmingly clinical information" and is a "frequent site for practitioners to visit[.]" N.T., 7/10/19, at 106.

By way of background, we note that during Dr. Dauber's testimony, Appellant presented to him for authentication three articles from UpToDate. Appellant simply stated the titles of the articles and noted each included "literature review current through June 2019." ***See*** N.T., 7/10/19, at 106-07. Without discussing the contents of those articles, Dr. Dauber testified that they were "authoritative." ***Id.*** at 107. Pertinently, Appellant did not ask Dr.

Dauber if the information contained in the articles was relevant at the time of the alleged malpractice, eight years earlier, in the present case.

Appellant then intended to cross-examine both Appellee Dr. Nama, and Appellees' expert witness, Dr. Stypula, with information contained in those articles. Before trial on the morning of July 15, 2019, the court ruled in chambers that it would not permit Appellant to use the UpToDate articles. *See* N.T., 7/15/19, at 3. Although the discussion was not transcribed, Appellant's counsel explained the court's ruling on the record prior to the start of the testimony:

> In chambers before we came into court, the Court indicated that it would prohibit the use of the articles that Dr. Dauber described as authoritative from the UpToDate source because Your Honor indicated you felt that they were not in the category of authoritative treatises or articles. Counsel for [Appellees] objected because they indicated that they were current through June of 2019. These articles are premised on literature surveys, and each and every cite in the article has a date and none of the matters set forth in the articles are related to — that I intend to cross-examine the experts with — are related to articles or standards that post-dated the treatment in this case. There are three of those. . . .

*Id.*

Appellant's challenge to the court's ruling is two-fold. She contends the trial court abused its discretion when it determined (1) the UpToDate publication did not qualify as a "learned treatise" and (2) the articles post-dated Decedent's care. Appellant's Brief at 15-18. First, Appellant maintains Dr. Dauber's testimony was sufficient to establish the UpToDate online resource qualified as a learned treatise. She notes Dr. Dauber testified the

site, which is frequently visited by practitioners, contains clinical information, and the specific articles Appellant intended to rely upon were "authoritative." *Id.* at 16. Appellant insists this testimony was "sufficient to lay the proper foundation for the Up[T]oDate publication to quality as a 'learned treatise.'" *Id.* Second, Appellant argues that, while the publication was current through June of 2019, the sources the articles relied upon "**antedated** [Decedent's] surgery." *Id.* at 18. Indeed, Appellant maintains the publication is "akin to an anthology of medical articles that a practitioner may consult on a variety of issues." *Id.* Because the opioid subsection upon which Appellant intended to rely included references that antedated Decedent's surgery, Appellant asserts the court's "broad refusal to allow [her] to cross[-]examine defense witnesses with this publication was an abuse of discretion[.]" *Id.*

Initially, our review of this issue was somewhat hampered because the discussion of Appellant's potential use of the UpToDate articles, as well as the court's ruling, occurred off the record. *See* N.T., 7/15/19, at 3. Moreover, although Appellant challenged the court's ruling in her post-trial motion, the court did not address that claim in its opinion. *See* Trial Ct. Op., 10/3/19, at 1-6.[4] Consequently, on January 4, 2021, we remanded this appeal and directed the trial court to file a supplemental opinion addressing "Appellant's claim that the court abused its discretion when it precluded her from cross-

---

[4] We note the trial court did not file a Pa.R.A.P. 1925(a) opinion, but rather, relied upon its October 3, 2019, opinion denying Appellant's post-trial motion. *See* Order, 1/6/20.

examining Appellees' witnesses regarding the online publication, 'UpToDate' [and] Appellant's proposed use of the publication." Order, 1/4/21, at 1. The trial court complied with our directive and filed a supplemental opinion on February 3, 2021.

Preliminarily, we note that in its supplemental opinion, the trial court did not discuss whether the UpToDate publication qualified as a learned treatise. Rather, the opinion focused on the relevance of the recent publication with regard to the questions presented at trial. *See* Trial Ct. Op., 2/3/21, at 5-6. Upon our review, we agree with Appellant that Dr. Dauber's testimony — that the UpToDate articles were "authoritative" — was sufficient to establish the online periodical as a learned treatise. *See Charlton*, 236 A.3d at 38 ("A 'learned treatise' is any textbook, published work, or periodical that has been accepted as authoritative or as reliable authority by members of a specific professional community.").

Nonetheless, we conclude Appellant is entitled to no relief because the publication date of the articles is the critical issue. As the court explained in its supplemental opinion, "the articles were exactly what [they] say they are, 'up to date' from June 2019." Trial Ct. Op., 2/3/21, at 5. **See** N.T., 7/10/19, at 106-07 (Dr. Dauber testifying the UpToDate articles were "current through June 2019"). However, the medical care at issue in the present case occurred in **July 2011**, nearly eight years before the publication. Therefore, the trial court concluded "the articles were not relevant to the trial discussing the standard of care as it was in 2011." Trial Ct. Op., 2/3/21, at 5.

Appellant insists, however, the section on opioids that she intended to use for cross-examination referenced "medical publications that **antedated** [Decedent's] surgery." Appellant's Brief at 18. Therefore, because the sources upon which the article relied were dated prior to Decedent's surgery, Appellant contends the trial court abused its discretion when it precluded her use of the publication for impeachment purposes. *See id.*

We disagree. The trial court explained that it precluded Appellant from cross-examining Drs. Nama and Stypula with the UpToDate articles,[5]

> because no specific showing of record was made concerning the date of the material Appellant proposed to us. The [c]ourt deemed that a specific showing was necessary because the content Appellant proposed to use consisted of articles current through June 2019 and referring to standards of care in place in July 2019, the time of the trial, when [D]ecedent's treatment in this case occurred eight years prior in 2011. The [c]ourt found that it would be improper for . . . Appellant to utilize the UpToDate articles to represent the standard of care during the 2011 time period with an article from June 2019 to impeach the witness's credibility.

Trial Ct. Op., 2/3/21, at 5-6. Here, Appellant simply failed to demonstrate the relevance of the 2019 publication with regard to the standard of care in 2011.

_____

[5] We note that in its supplemental opinion, the trial court indicates it "permitted Appellant's counsel to ask five specific questions on cross-examination which . . . effectively allow[ed] for impeachment of the witness[es] without publishing the article[s] to the jury." Trial Ct. Op., 2/3/21, at 5. However, the record reveals the court permitted this limited examination only with respect to the other learned treatise Appellant introduced – a publication by the Pennsylvania Patient Safety Authority. *See* N.T., 7/12/19, at 23-25. The court prohibited all references to the UpToDate articles. *See* N.T., 7/15/19, at 3.

- 10 -

As Dr. Nama explains in his brief, "the dates of the **studies** are irrelevant to the consideration of whether the **article** post-dated the treatment." Dr. Nama/Laurel Group Brief at 15 (emphasis added). He emphasizes that because "Appellant provided only the June 2019 UpToDate article to counsel and the [c]ourt, there is no way to know how the article was updated in 2019 or whether the article was originally published prior to the treatment at issue." *Id.* Indeed, Appellant sought to cross-examine Drs. Nama and Stypula with the 2019 article, **not** the studies referenced in the article.

Thus, we conclude the trial court did not abuse its discretion when it precluded Appellant from using the UpToDate publication to impeach Drs. Nama and Stypula. Indeed, Dr. Dauber testified **only** that the UpToDate articles, current through June of 2019, were "authoritative." *See* N.T., 7/10/19, at 106-07. He did not offer any opinion as to whether the articles contained information that was authoritative at the time of the incident in question. Accordingly, Appellant is entitled to no relief on this claim.

Appellant's next two issues concern the court's restriction of her use of another learned treatise — a publication by the Pennsylvania Patient Safety Authority (PPSA) entitled "Adverse Drug Events with Hydromorphone: How Preventable Are They?" *See* Appellant's Brief at 6 n.2. Similar to the UpToDate publication, the trial court permitted Appellant to present the PPSA article to Dr. Dauber for authentication. N.T., 7/10/19, at 106. Dr. Dauber testified that the article, dated September 2010, was "authoritative." *Id.* Appellant intended to use the article to cross-examine Dr. Nama and his

expert witness, Dr. Stypula. *Id.* at 9-10. At that time, the court did not determine how the article could be used during Appellant's examination of Appellees' witnesses. *See id.* at 92-93.

The trial court revisited the issue on the morning of July 12, 2019, when Appellant indicated she intended to call Dr. Nama as an adverse witness during her case-in-chief. N.T., 7/12/19, at 3. Upon inquiry by the trial court, Appellant stated she intended to impeach Dr. Nama with the PPSA article which, she averred, directly contradicted Dr. Nama's assertion that the dosage of Dilaudid he approved for Decedent was appropriate. *See id.* at 5. Appellant asserted the article stated a **single dose** of "one milligram, half of what this doctor ordered, or greater for an elderly patient who was opioid-naive" was "an inappropriate dose." *Id.* After hearing argument from both sides, the court ruled that Appellant could ask Dr. Nama the following questions concerning the PPSA article:[6]

> Are you familiar with the article, citing the name of the article; the date of the article, which was in 2010; which predated the operation[?]
>
> *  *  *
>
> [D]id you take any of the contents of this article into consideration when you treated [Decedent]?

___

[6] The trial court indicated that it derived the questions from Philadelphia County Court of Common Pleas Judge Mark I. Bernstein's treatise on the Pennsylvania Rules of Evidence, 2018 edition. *See* N.T., 7/12/19, at 25. The relevant text is appended to Appellant's brief as Addendum IV.

Did you rely upon the contents of the article when you authorized the dosage for her?

Do you agree with the content of the article?

And do you agree that your authorized dosage is at variance, the word at variance, with the recommended dosage in the article?

*Id.* at 23-24. The court later sustained Appellees' objection to use of the phrase "recommended dosage" in the final question, and Appellant rephrased the question to inquire whether Dr. Nama agreed that the dosage he prescribed to Decedent varied from the dosage "described" in the article.[7] *Id.* at 40-41, 45. The trial court also specifically prohibited Appellant from reading the article to the jury during the examination. *Id.* at 20-21.

Appellant subsequently called Dr. Nama as an adverse witness, and asked him the above-stated questions. *See* N.T., 7/12/19, at 43-45. In response, Dr. Nama acknowledged: (1) he was aware of the article before he treated Decedent; (2) he took the contents of the article into consideration when he treated her; and (3) the dosage of hydromorphone he authorized for Decedent was "at variance with the dosage described in the article." *Id.* at 44-45. Dr. Nama further indicated he did not rely upon the article when he authorized Decedent's dosage, and, when asked if he agreed with the "content

---

[7] Appellant also complains that the trial court did not permit her to substitute the phrase "appropriate dosage" for "recommended dosage." Appellant's Brief at 28. However, she did not identify this purported erroneous ruling in her post-trial motion. Thus, any allegation of error is now waived. *See Bd. of Supervisors of Willistown Twp v. Main Line Gardens, Inc.*, 155 A.3d 39, 44 (Pa. 2017).

of the article as it relates to dosages of hydromorphone[,]" he responded, "Not completely." *Id.* at 45 (some capitalization omitted).

With this background in mind, we address Appellant's claim that the trial court abused its discretion when it restricted her cross-examination of Dr. Nama to the specific questions listed above. *See* Appellant's Brief at 29. First, Appellant insists the court "highjacked" her cross-examination of Dr. Nama by requiring her to ask "each and every one of the . . . questions it had formulated[.]" *Id.* at 30. Appellant cites to the transcript where she asked the court if she had to ask Dr. Nama the fourth question — if he agreed with the content of the article — and the court replied, "Yes, I already did this." *See id.* at 30, *citing* N.T., 7/12/19, at 42 (emphasis omitted). Moreover, she argues that she was then required to end her cross-examination after asking the court-formulated questions, despite the fact that Dr. Nama's final answer "implied that he **agreed with some** of the dosage information in the PPSA article." *Id.* at 32 (emphasis added). Appellant maintains: "Dr. Nama's response on an issue of substantive importance should have triggered an opportunity for [her] to explore with some adversarial depth the extent to which Dr. Nama did agree with the article." *Id.* Indeed, Appellant contends the court abused its discretion when it required her to ask Dr. Nama the court-formulated questions — and only those questions — regardless of the witness's responses. *See id.* at 30.

Here, the trial court explained that it limited Appellant's use of the PPSA article for impeachment purposes to "ensure this inadmissible hearsay was

not presented as substantive evidence to the jury." Trial Ct. Op., 10/3/19, at 3. We detect no abuse of discretion.

As noted above, a learned treatise, which is deemed authoritative by experts in the field, may be used to impeach an expert witness. *Charlton*, 236 A.3d at 39. This Court has also extended this limited use of learned treatises to the cross-examination of fact witnesses. *See Crespo*, 167 A.3d at 186 (noting the trial court correctly permitted cross-examination of doctor defendant with learned treatise). However, the law is well-settled that the contents of such publications are hearsay, and not admissible for the truth of the matter asserted therein. *Majdic*, 537 A.2d at 339. Thus, when a trial court has failed to place appropriate limitations on the use of learned treatises, and the information contained therein has been read to the jury, the appellate courts have not hesitated to find error. *See Aldridge*, 750 A.2d at 298 (trial court abused its discretion when it failed to "impose appropriate constraints" on appellee's use of learned treatise that supported expert's opinion on direct examination); *Burton-Lister*, 798 A.2d at 239 (trial court abused its discretion when it permitted appellee to "read into the record" parts of learned treatise while cross-examining appellant doctor).

Upon our review of the record, we conclude the trial court's formulation of specific questions, aimed at limiting Appellant's use of the PPSA article for impeachment purposes only, did not constitute an abuse of discretion. Indeed, through her questioning, Appellant was able to show the jury that the dosage of Dilaudid Dr. Nama approved for Decedent was "at variance with the

dosage described in the article[.]" N.T., 7/12/19, at 45. Further, Dr. Nama conceded that he was aware of the article at the time of treatment, and took some of the contents of the article into consideration when treating Decedent. *Id.* at 44-45. This, coupled with Dr. Dauber's testimony that the article was authoritative, constituted a permissible, limited use of a learned treatise.

To the extent Appellant now complains that the trial court "highjacked" her cross-examination — by forcing her to ask questions she did not want to, and then precluding her from asking any follow-up questions — we conclude these arguments are waived. First, the record does not support her claim that she was "force[d]" to ask Dr. Nama questions she did not believe should have been "advanced in the first place." *See* Appellant's Brief at 30. Indeed, just prior to calling Dr. Nama as an adverse witness, Appellant asked the court, "Do I have to ask the one [question], do you agree with the content of the article?" N.T., 7/12/19 at 42. The court responded, "Yes, I already did this." *Id.* At that point, Appellant responded, "Okay. Fair enough. Okay." *Id.* That was the extent of Appellant's "objection." Appellant did not inform the court that she felt it was highjacking her examination, nor did she provide any explanation as to why she believed the final question was inappropriate. Accordingly, no relief is warranted. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Similarly, after Appellant asked Dr. Nama the court-approved questions, she stated, "Thank you, Dr. Nama, that is all I have." N.T., 7/12/19, at 45.

Appellant now insists that Dr. Nama's response that he did not **completely** agree with the contents of the PPSA article "implied that he agreed with **some** of the dosage information" in the article, and warranted further questioning. Appellant's Brief at 32 (emphasis added). However, because Appellant did not ask the court to reconsider its ruling in light of Dr. Nama's response, her claim is now waived.[8] ***See*** Pa.R.A.P. 302(a).

Appellant also contends the trial court abused its discretion when it restricted her cross-examination of Appellees' expert, Dr. Stypula, with regard to the same PPSA article. She argues the trial court erred when it limited her examination of Dr. Stypula to the same questions formulated for her examination of fact witness (and opposing party) Dr. Nama. Appellant's Brief at 24-25. Indeed, she maintains the court should have permitted her to impeach Dr. Stypula with the statement in the PPSA that "any dosage of one milligram or greater for a woman of [Decedent's] physical profile is 'inappropriate.'" ***Id.*** at 26.[9]

_____

[8] Appellant's assertion that she "risked nothing less than the wrath of the trial court" had she requested to continue questioning does not overcome her waiver of this claim. ***See*** Appellant's Brief at 32 n.12.

[9] We note Appellant also claims that, rather than restricting her use of the article on cross-examination, the trial court should have issued a limiting instruction to the jury, explaining that the text was used "solely to impeach" the expert's testimony. Appellant's Brief at 28-29. This claim was not raised in Appellant's post-trial motion, and is, thus, waived on appeal. ***See Bd. of Supervisors of Willistown Twp.***, 155 A.3d at 44.

Again, we conclude Appellant is entitled to no relief. As noted *supra*, while an expert may be cross-examined with a learned treatise that is recognized as authoritative in the relevant field, the document may not be "admitted for the truth of the matter asserted, but only to challenge the credibility of the witness' opinion and the weight to be accorded thereto." *Majdic*, 537 A.2d at 339. The questions formulated by the trial court appropriately limited the use of the PPSA article to impeachment purposes only.

To the extent Appellant insists the questions were drafted to be used only during the cross-examination of a **fact** witness, we disagree. *See* Appellant's Brief at 22-23. As noted above, the questions were derived from a treatise on evidence, authored by Philadelphia Court of Common Pleas Judge Bernstein, discussing Pennsylvania Rule of Evidence 803(18). *See* Appellant's Brief, Addendum IV, Bernstein Treatise. The Comment to Rule 803(18) states that "Pennsylvania does not recognize an exception to the hearsay rule for learned treatises." Pa.R.E. 803(18), comment. Under the heading "Impeachment of **Expert Witness**[,]" Judge Bernstein explains that, pursuant to the Rule, "[a] learned treatise may be used to **cross-examine an expert** as to his . . . qualifications, knowledge, opinions or biases." Appellant's Brief, Addendum IV, Bernstein Treatise at 859 (emphases added). Under the same subsection, Judge Bernstein provides a list of "proper questions" that may be asked during cross-examination of an expert to ensure the text is not admitted for the truth of the matter asserted in violation of the

rule. *See id.* at 861. The questions crafted by the trial court in the present case parrot those listed in the Bernstein text. Furthermore, Appellant's attempt to differentiate the use of a learned treatise when it is used to cross-examine a witness, as opposed to a party, also fails. *See* Appellant's Brief at 24-25. Indeed, in whatever manner a learned treatise is used, "[u]nder Pennsylvania law, **the contents of a learned treatise** offered at trial to establish principles or theories **is inadmissible hearsay**[.]" *Charlton*, 236 A.3d at 38 (emphases added).

Appellant also maintains the trial court's ruling precluded her from attacking Dr. Stypula's opinion that "the two milligrams of Dilaudid that [Decedent] received was not too much[.]" Appellant's Brief at 25. She insists:

> A medical malpractice trial that allows the opinion of an expert to go unchecked when medical authority to the contrary expressly contradicts not only the opinion of the expert, but even the very words the expert has used to communicate an opinion to the jury, makes for not merely an imperfect trial, but a trial that is manifestly unfair.

*Id.* at 26.

However, the limitations the trial court placed on Appellant's use of the PPSA article did not permit Dr. Stypula's opinion to go "unchecked." See Appellant's Brief at 26. Rather, as evident in the following exchange, Appellant was able to demonstrate to the jury that Dr. Stypula's opinion regarding the appropriate dosage of Dilaudid for Decedent differed from the appropriate dosage set forth in the article:

> [Appellant's counsel:] Doctor, I want to show you an article entitled Adverse Drug Events with HYDROmorphone: How

Preventable Are They, from the [PPSA] that was issued to advise medical facilities of immediate changes that could be instituted to reduce serious events and incidents. . . .

\* \* \*

[Appellant's lawyers gave you the article a]nd asked you to read it?

[Dr. Stypula:]  Yes.

[Appellant's counsel:]  Do you agree with the contents of that article, sir?

[Dr. Stypula:]  No.

[Appellant's counsel:]  Did you take into account in looking at the Dilaudid dose in this case the information in the publication?

[Dr. Stypula:]  No, I didn't have it.  I had not — I'm not familiar with that publication.  And when I formed my opinion, I didn't use it.

[Appellant's counsel:]  The opinion expressed in this publication in respect to Dilaudid is different than what you have told the jurors, isn't it?

[Dr. Stypula:]  Yes.

N.T., 7/16/19, at 173-74.  Accordingly, we detect no abuse of discretion in the trial court's ruling.  ***See Crespo***, 167 A.3d at 181.

Moreover, we note that even if we were to conclude the trial court abused its discretion when it limited Appellant's use of the PPSA article on cross-examination, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party."  ***See Crespo***, 167 A.3d at 181 (citation omitted).  First, as noted ***supra***, Appellant was able to establish, through the cross-examination of Drs. Nama and Stypula, that the dosage of Dilaudid Decedent received, which both doctors opined was appropriate, varied from the dosage described in the PPSA

article. *See* N.T., 7/12/19, at 45; 7/16/19, at 174. Second, Appellant was able to establish, through the testimony of her expert witnesses, that a dosage of more than one milligram of Dilaudid was an inappropriate, and potentially harmful, dosage for Decedent. *See* N.T., 7/10/19, at 138-40 (Appellant's expert anesthesiologist, Dr. Dauber, testifying that "[i]t was below the standard of care to give" Decedent 2 milligrams of Dilaudid; noting, "[i]f 1 milligram was indeed necessary to be given, it could have been given in more typical increments, like 0.2 milligrams every five to ten minutes monitoring vital signs, including pain"); N.T., 7/11/19, at 93, 95-96 (Appellant's expert registered nurse, Debra Ebersole, testifying that the administration of "[t]he first dose of Dilaudid was not within the standard of care for [Decedent] because of her comorbidities[;]" explaining "[i]f this were my patient . . . I would have started at 0.2 milligrams . . . and see how she reacts to it"). Thus, no relief is warranted on Appellant's second claim.

Lastly, Appellant argues the trial court abused its discretion when it excluded certain testimony by Decedent's respiratory therapist based upon a pretrial stipulation. Appellant's Brief at 33. By way of background, we note Appellees filed a motion in *limine* to preclude Appellant from offering any hearsay testimony that Decedent's death was the result of an overdose.[10] *See*

_____

[10] The motion indicated that during his deposition, Dr. Nama was asked if he "recalled other physicians at [Hospital] telling him that Decedent's arrest was caused by an overdose of Dilaudid." Appellees' Motion in Limine to Preclude Hearsay Evidence Regarding the Cause of Decedent's Arrest and/or Overdose (Motion in Limine), 3/27/19, at 1.

Appellees' Motion in Limine at 1-2. Appellant did not oppose the motion. Thus, on May 8, 2019, the trial court entered an order directing that "[Appellant] shall not be permitted to introduce any hearsay evidence at the time of trial, related to comments made by other physicians regarding the cause of Decedent's arrest and/or an overdose." Order, 5/8/19.

Three weeks before trial, Appellant filed a Fourth Supplemental Pretrial Statement, which listed one additional fact witness, Carl Kenyon. *See* Appellant's Fourth Supplemental Pretrial Statement, 6/17/19, at 1 (unpaginated). No further information about Kenyon's proposed testimony was provided. After Kenyon was called to testify on July 11, 2019, the trial court asked Appellant the purpose of Kenyon's testimony. N.T., 7/11/19, at 4. Appellant responded that Kenyon was Decedent's respiratory therapist at Hospital. *Id.* She further stated Kenyon became friendly with Decedent and her family, and later visited Decedent in her home. *Id.* Appellant asserted: "[H]e is mostly going to talk about her condition and the medical events in the ICU that he was aware of so he is really a fact witness." *Id.* After further discussion, Appellant acknowledged she intended to elicit testimony from Kenyon that he was told by another doctor that Decedent "was overdosed[.]" *Id.* at 8. Appellant argued such a statement was not hearsay because it was made "in the course of medical treatment." *Id.* The trial court precluded that testimony based upon its May 8, 2019, pretrial order.

On appeal, Appellant contends the pretrial order precluded only "hearsay statements for which there are **no applicable exceptions**."

- 22 -

Appellant's Brief at 34 (emphasis added). She maintains that is the only reason she did not oppose the motion. *See id.* ("[Appellant's] counsel would never in a million years have acquiesced to the motion outright had he believed it encompassed statements for which a recognized hearsay exception applied."). Rather, Appellant insists Kenyon's proposed testimony was admissible as a statement made for medical treatment and diagnosis pursuant to Pennsylvania Rule of Evidence 803(4).[11] She explains:

> [The] excluded statement to Mr. Kenyon . . . addressed both the "cause" of [Decedent's] need for respiratory therapy and "how" she sustained the need for it. Cardiac arrest may have multiple etiologies, each of which may require a different subset of treatments. It was therefore necessary for Mr. Kenyon to know the cause of [Decedent's] cardiac arrest if he was to administer respiratory therapy to her in a safe and medically efficacious manner talked to her etiology.
>
> . . . A statement from an ICU physician to a patient's respiratory therapist that the patient overdosed . . . is obviously one that addresses the "nature and type of injury" because it serves to educate the therapist on a particular etiology that could direct the course of the patient's respiratory therapy. . . .

*Id.* at 36 (citations omitted).

_____

[11] Rule 803(4) provides an exception to the rule against hearsay when an out of court statement:

> (A) is made for — and is reasonably pertinent to — medical treatment or diagnosis in contemplation of treatment; and
>
> (B) describes medical history, past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to treatment, or diagnosis in contemplation of treatment.

Pa.R.E. 803(4)(A)-(B).

The trial court found Kenyon's proposed testimony fell squarely within its pretrial order precluding "any hearsay evidence . . . related to comments made by other physicians regarding the cause of Decedent's arrest and/or overdose." Trial Ct. Op., 10/3/19, at 4, *citing* Order, 5/8/19. We agree. Appellant stipulated to the broad language in the pretrial order, and, despite her present complaints, did not request an exception for hearsay statements made during the course of medical treatment. Thus, her claim fails.

Furthermore, we note that even if we agreed that the pretrial order may not have included statements made for the purposes of medical treatment, we conclude Appellant has failed to establish the statement at issue would have been admissible pursuant to Rule 803(4). "The following two requirements must be satisfied in order for a statement to qualify as a medical treatment exception: (1) the statement must be made for the purpose of receiving medical treatment; and (2) the statement must be necessary and proper for diagnosis and treatment." ***Commonwealth v. Belknap***, 105 A.3d 7, 11 (Pa. Super. 2014).

In her brief, Appellant baldly asserts Kenyon may have needed to know the underlying cause of Decedent's cardiac arrest to "direct the course of [Decedent's] respiratory therapy." ***See*** Appellant's Brief at 36. However, she provides no explanation — save for generalized statements that different "etiologies . . . may require a different subset of treatments" — why this is so. ***See id.*** Moreover, Appellant made a similarly conclusory argument in the trial court. In fact, in asserting the statement was admissible, counsel for

Appellant commented only: "And these are statements made in the course of medical treatment, Your Honor, so they are not hearsay." N.T., 7/11/19, at 8. Thus, Appellant has failed to demonstrate the purported statement of another physician — that an overdose caused Decedent's cardiac arrest — was "necessary for proper diagnosis and treatment." *See Belknap*, 105 A.3d at 11. Accordingly, Appellant's claim would fail even if we agreed the statement was not precluded by the court's pretrial order. *See Commonwealth v. D.J.A.*, 800 A.2d 965, 977 (Pa. Super. 2002) (*en banc*) (affirming preclusion of statement made by child sex abuse victim to doctor implicating father as abuser because it was not necessary for diagnosis or treatment; "[w]hile sexual abuse carries with it the danger of contracting a sexually transmitted disease, a child's statement identifying the perpetrator cannot obviate that danger, nor can such a statement, standing alone, determine whether the child should be tested and/or treated for a sexually transmitted disease").

Because we conclude Appellant is entitled to no relief on any of the claims raised on appeal, we affirm the judgment in favor of Appellees.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>3/23/2021</u>